NOT DESIGNATED FOR PUBLICATION

No. 119,444

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of M.P.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Shawnee District Court; MARY E. CHRISTOPHER, judge. Opinion filed June 7, 2019. Affirmed.

*Pantaleon Florez, Jr.*, of Topeka, for appellant natural father.

*Rebekah A. Phelps-Davis*, of Phelps-Chartered, of Topeka, for appellee interested parties.

Before GARDNER, P.J., GREEN and ATCHESON, JJ.

PER CURIAM:  This case is fraught with tragedy. As we outline, M.P. suffered profound and lasting injuries at the hands of her mother about a month after her birth. M.P.'s father, who had separated from M.P.'s mother before the child was born and played no part in causing her injuries, stepped in and offered to parent M.P. after she was taken into protective custody. But R.R. has been unable to master the skills necessary to care for M.P., given her extraordinary physical and cognitive deficits. Under these unusual circumstances, the Shawnee County District Court properly found R.R. to be statutorily unfit to parent M.P. and terminated his rights notwithstanding his obvious affection and concern for his daughter. We, therefore, affirm the district court.

1

We draw the key facts from an extensive district court record. R.R. and V.P., M.P.'s mother, were not married. After V.P. became pregnant, she broke off the relationship with R.R. and had a new live-in boyfriend by the time she gave birth in December 2016. V.P. denied R.R. any contact with the newborn. About a month later, V.P. took M.P. to a local hospital because the child appeared to be having seizures. Emergency room physicians diagnosed M.P. as having intracranial bleeding. She was promptly transferred to Children's Mercy Hospital in Kansas City, Missouri.

A physician with expertise in diagnosing child abuse examined M.P. and found expansive subdural brain hemorrhaging with concomitantly substantial damage to M.P.'s brain. The physician ruled out causes other than trauma and concluded M.P. was likely the victim of child abuse.

Three days after V.P. brought M.P. to the hospital, the Department for Children and Families began court proceedings to have M.P. declared in need of care under the Revised Kansas Code for Care of Children, K.S.A. 2018 Supp. 38-2201 et seq. The district court quickly entered a temporary order granting custody of M.P. to the Department. She was placed with D.K. and K.K., a foster couple experienced with special needs children.

R.R. found out M.P. had been hospitalized and that the State had begun a child in need of care proceeding when his court-appointed lawyer contacted him. In early March 2017, the district court adjudicated M.P. as being in need of care and granted R.R.'s request for paternity testing. About six weeks later, after the test results confirmed R.R. to be M.P.'s father, the district court entered an order permitting him to actively participate in this case.

Law enforcement officers simultaneously began an investigation into the circumstances of M.P.'s injuries and questioned V.P. Ultimately, V.P. admitted she had become frustrated with M.P.'s crying, picked her up, and shook her to get her to quiet down. V.P. told the officers she did not intend to harm M.P. Those statements were introduced in this case to support the termination of V.P.'s parental rights. The district court found V.P. to be unfit and terminated her rights. V.P. is not a party to this appeal and apparently has not challenged the district court ruling.

Before R.R.'s paternity was genetically confirmed, M.P. deteriorated physically, and her foster placement had her readmitted to Children's Mercy Hospital. The team of healthcare professionals attending to M.P. determined her brain function had continued to decline. They estimated 85 to 90 percent of M.P.'s brain had been damaged. To describe M.P. as a special needs child because of that brain damage engages a euphemistic understatement.

M.P. cannot consistently breathe or swallow on her own. M.P.'s impaired ability to breathe requires she have a tracheostomy, breathing tube, and continuous mechanical assistance. Because M.P. can't swallow, she must be fed through a gastrointestinal tube. She is unlikely to walk or talk and has limited vision. M.P. has epileptic seizures, painful involuntary muscle contractions, and an irregular heartbeat. Those conditions require she take a spectrum of medications. M.P. has severe cognitive deficits, as well, and functions at a low intellectual level. Those conditions will not materially improve as M.P. grows up.

M.P. must be fed every few hours, a routine that itself takes several hours a day. The gastrointestinal tube has to be regularly checked and cleaned. M.P.'s heart rate has to be continuously monitored. And, perhaps most critically, M.P.'s tracheostomy tube frequently has to be cleared of secretions and otherwise maintained and routinely replaced. Failure to conscientiously attend to M.P.'s tracheostomy could compromise her

3

breathing with fatal consequences. Laypersons typically can learn the essential skills necessary to maintain tracheostomies, do gastrointestinal feedings, and monitor heart rates. But they have to go through a series of training exercises typically with the patient for whom they will be providing care. Those exercises impart the skills. The caregivers, however, have to successfully repeat those skills over and over again under supervision to achieve the necessary proficiency to perform them in a home setting without the presence of trained medical personnel. Children's Mercy Hospital recommends that two adult caregivers in a household become proficient in the necessary skills. Although M.P. does not require a sterile environment, the tracheostomy tube and, to a lesser extent, the feeding tube make her prone to infections, so she needs to live in a home relatively free of external contaminants.

D.K. is a nurse with advanced training, and K.K. is proficient in the particularized skills M.P. requires from a residential caregiver. D.K. and K.K. have considerable experience providing in-home care to children with significant mental and physical impairments. They have had physical custody of M.P. since February 2016.

D.K. and K.K. informed the district court they wish to adopt M.P. As interested parties, D.K. and K.K. filed a motion to terminate the parental rights of both R.R. and V.P. to facilitate the adoption. See K.S.A. 2018 Supp. 38-2241(d) (interested parties include persons with whom child resides); K.S.A. 2018 Supp. 38-2266 (interested party can move to have parents found unfit and their rights terminated or permanent custodian appointed for child). The district court held a four-day evidentiary hearing on the motion to terminate in mid-April 2018 and filed a written order of termination several weeks later.

We focus on the evidence at the termination hearing bearing on the grounds the district court relied on to find R.R. unfit under the Code. R.R. was generally attentive to M.P. during her second hospitalization after the district court recognized his paternity and

4

permitted visitation. KVC, as the assigned social service agency, set up a plan to integrate R.R. and M.P. as a family. After M.P. was released from the hospital, R.R. had regularly scheduled visits with M.P. But a confluence of adverse circumstances ultimately confounded R.R.'s efforts to become proficient in the skills necessary to care for M.P.

The integration plan permitted R.R. two visits a month with M.P. As a general matter, R.R. could choose to allocate one or both of those visits to skills training at Children's Mercy Hospital. During the two years leading up to the termination hearing, R.R. sought to schedule training once a month. R.R. resided with his mother in an older home in Topeka. His mother planned on becoming the second trained caregiver for M.P.

R.R. or his mother sometimes had to reschedule the training. Other times, a KVC caseworker could not attend, and that also required rescheduling. Because the training was done at Children's Mercy Hospital, M.P. had to be transported from Topeka to Kansas City and back for those sessions. Given her fragile condition, those trips could be arduous for her, especially if she were not otherwise feeling well. They tended to physically tire M.P. and often upset her emotional equilibrium. Many sessions were cancelled because M.P. simply wasn't up to the trip. For four months in 2017, KVC increased the allotted visits between R.R. and M.P. to the equivalent of once a week.

The evidence at the hearing suggested R.R. had learned the skills to take care of M.P. at home but had not achieved proficiency. His mother seemed to lag behind him. Children's Mercy Hospital tested caregivers' proficiency by having them stay at the hospital for 48 hours with the person requiring assistance. Hospital personnel would monitor their interaction and step in, if necessary, to assure the person's wellbeing. R.R. and his mother never attempted the proficiency testing. At the termination hearing, R.R. acknowledged he did not yet feel ready to care for M.P. at home. A nurse from Children's Mercy Hospital involved in the training testified that R.R. and his mother would need

5

weekly sessions for six months to become proficient and even then proficiency couldn't be guaranteed.

Secondarily, the house in which R.R. and his mother lived was described as if it were dilapidated and undergoing renovation that left uncovered walls along with other exposed areas. KVC caseworkers also noted in several inspections an unremediated mold problem in a portion of the house. Those conditions posed a direct hazard to M.P.'s health.

Apart from those circumstances, R.R. made material progress in satisfying the family unification plan. R.R. was employed. He appeared to be a caring father with at least average parenting skills. Nothing else, such as chronic drug abuse, posed a serious obstacle to his assuming legal and physical custody of a typical child. But M.P. was atypical, and her atypicality presented circumstances that if neglected or handled improperly could quickly threaten her life.

Based on that evidence, the district court found R.R. to be statutorily unfit in three respects:

• Reasonable efforts of appropriate public and private agencies failed to rehabilitate the family, as provided in K.S.A. 38-2269(b)(7);

• He demonstrated a lack of effort to adjust his circumstances or conduct to meet M.P.'s needs, as provided in K.S.A. 38-2269(b)(8); and

• M.P. has been in an out-of-home placement as a result of his action or inaction, and he has failed to carry out a reasonable family unification plan, as provided in K.S.A. 38-2269(b)(9) and (c)(3).

6

The district court also found that R.R. was unlikely to become fit in the foreseeable future and M.P.'s best interests would be advanced by terminating R.R.'s parental rights. Those findings satisfy the necessary statutory requirements for termination—unfitness, unlikelihood of change, and child's best interests. The district court, thus, entered a termination order. R.R. has timely appealed.

LEGAL ANALYSIS

On appeal, R.R. challenges each of the statutory requirements underlying the district court's termination order. Before analyzing those arguments, we outline key legal principles governing the termination of parental rights.

A parent has a constitutionally recognized right to a continuing relationship with his or her child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008) (citing *Santosky*). The right entails a substantive liberty interest shielded in the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (substantive liberty interest); *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925) (recognizing "the liberty of parents and guardians to direct the upbringing and education of children under their control"). Accordingly, the State may terminate a parent's right to raise a minor child only upon clear and convincing proof of parental unfitness. K.S.A. 2018 Supp. 38-2269(a); *Santosky*, 455 U.S. at 769-70; *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

After a child has been adjudicated in need of care, as M.P. was here, a district court may terminate parental rights "when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to

7

change in the foreseeable future." K.S.A. 2018 Supp. 38-2269(a). In considering a parent's unfitness, the district court may apply one or more of the grounds outlined in K.S.A. 2018 Supp. 38-2269(b) and (c). A single ground may be sufficient to establish unfitness. See K.S.A. 2018 Supp. 38-2269(f). The district court may rely on the general statutory standard in K.S.A. 2018 Supp. 38-2269(a) or nonstatutory circumstances demonstrating parental unfitness. See K.S.A. 2018 Supp. 38-2269(b) (district court "not limited to" listed factors in considering unfitness).

The specific statutory factors are illustrative of parental "unfitness," but the Code contains no formal definition of the term. The Kansas Supreme Court has surveyed cases discussing unfitness in termination proceedings and suggests the condition rests on unsuitability and incompetence, often coupled with some moral dereliction. *In re Brooks*, 228 Kan. 541, 546-47, 618 P.2d 814 (1980). This court has equated unfitness with the "incapacity to perform parental obligations." *In re A.N.P.*, 23 Kan. App. 2d 686, 692, 934 P.2d 995 (1997); see *In re Adoption of A.M.M.*, No. 109,247, 2013 WL 5507483, at *5 (Kan. App. 2013) (unpublished opinion); *In re Baby Girl E.*, No. 103,740, 2010 WL 4668356, at *4 (Kan. App. 2010) (unpublished opinion). More recently, this court has pointed out that simply being a below average parent does not amount to unfitness warranting termination, even if other available options arguably might be demonstrably better for the child. *In re A.M.*, No. 116,391, 2017 WL 2022704, at *1 (Kan. App. 2017) (unpublished opinion).

We also point out that parental unfitness under the Code is not fault based but, rather, turns on a parent's ability to sufficiently care for his or her child. Neither inattention nor willful misconduct is a necessary condition for a judicial finding. So a parent who tries hard yet cannot adequately care for a child is unfit within the meaning of K.S.A. 2018 Supp. 38-2269(a). See *In re A.L.E.A.*, No. 116,276, 2017 WL 2617142, at *6 (Kan. App.) (unpublished opinion), *rev. denied* 307 Kan. 986 (2017). We have recognized that parents who love their children may, nonetheless, be unfit. See *In re A.A.*,

38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008); *In re A.L.E.A.*, 2017 WL 2617142, at *6. Similarly, we have found parents unfit because they cannot meet the special needs of a child with significant physical or mental impairments. See *In re P.L.*, No. 120,220, 2019 WL 2063874, at *4 (Kan. App. 2019) (unpublished opinion) (child's "ongoing special healthcare needs" factor in finding mother unfit); *In re M.V.J.*, No. 117,401, 2017 WL 5184341, at *5 (Kan. App. 2017) (unpublished opinion) (child's need for "highly attentive care on a daily basis without interruption or disruption" supported termination of mother's parental rights). Statutory unfitness isn't so much a standardized level of inadequacy applicable across cases as it is a particular condition grounded in the facts of a given case.

In assessing the unlikelihood of change in the foreseeable future under K.S.A. 2018 Supp. 38-2269(a), we gauge the permissible duration using "child time" as the measure. As the Revised Kansas Code for Care of Children, K.S.A. 2018 Supp. 38-2201 et seq. recognizes, children experience the passage of time in a way that makes a month or a year seem considerably longer than it would for an adult, and that difference in perception typically tilts toward a prompt, permanent disposition. K.S.A. 2017 Supp. 38-2201(b)(4); *In re M.B.*, 39 Kan. App. 2d 31, 45, 176 P.3d 977 (2008); *In re G.A.Y.*, No. 109,605, 2013 WL 5507639, at *1 (Kan. App. 2013) (unpublished opinion) ("'child time'" differs from "'adult time'" in care proceedings "in the sense that a year . . . reflects a much longer portion of a minor's life than an adult's").

When the sufficiency of the evidence supporting a district court's decision to terminate parental rights is challenged, an appellate court will uphold the findings of unfitness and unlikelihood of change if, after reviewing the evidence in the record in a light most favorable to the prevailing party, they are supported by clear and convincing evidence. Stated another way, the appellate court must be persuaded that a rational fact-finder could have found it highly probable that the circumstances justify unfitness and unlikelihood of change as components of the termination of parental rights. *In re B.D.-Y.*,

286 Kan. at 705. In evaluating the record, the appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or determine factual questions. *In re Adoption of B.B.M.*, 290 Kan. 236, 244, 224 P.3d 1168 (2010); *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Here, we must view the evidence presented at the termination hearing in favor of D.K. and K.K., as the parties prevailing on the motion to terminate.

We take up unfitness and unlikelihood of change and then turn to the best interests component of termination. This is, to say the least, a highly unusual case. M.P. is an extraordinary child with extraordinary needs. R.R. has been motivated throughout this case by an admirable combination of moral obligation to M.P., as his daughter, and earnest willingness to assume the burden of caring for her. But for two years, R.R. tried to fashion those worthy intentions into a concrete reality that would allow him to parent M.P. He has been unable to do so.

As R.R. acknowledged at the termination hearing, he did not yet have the skills to care for M.P. And to reemphasize the critical point here, without those skills, R.R. not only would be unable to adequately care for M.P. as a custodial parent, he would pose a grave danger to her. That was the reality the district court had to weigh against R.R.'s goodwill and heartfelt desire. Consistent with the language in K.S.A. 2018 Supp. 38-2269(a), R.R. was unfit to parent M.P. The evidence could not reasonably be construed any other way. The district court, therefore, correctly found statutory unfitness.

The circumstances plainly conform to K.S.A. 2018 Supp. 38-2269(a), rendering a parent unfit if he or she is "unable to care properly for [the] child." And that is enough. It is less clear that the particularized grounds in K.S.A. 2018 Supp. 38-2269(b) and (c) the district court cited necessarily apply to the unusual facts of this case. But we will affirm a district court when the result is right, even if the stated ground for the result may not be. *Rose v. Via Christi Health System, Inc.*, 279 Kan. 523, 525, 113 P.3d 241 (2005). R.R.

10

had limited opportunities to learn and, more importantly, become proficient in the healthcare skills vital to M.P.'s wellbeing. Many of the training sessions were cancelled because of things outside of R.R.'s control. Often, M.P.'s fragile condition precluded her travelling to and from Children's Mercy Hospital for the sessions. Other times, KVC's caseworker couldn't attend. Those problems suggest the inapplicability of the statutory factors resting on R.R.'s lack of effort or failure to carry out a family unification plan. Similarly, the plan itself may not have been entirely reasonable. But no plan may have been realistic.

And that leads into unlikelihood of change—the other component of statutory unfitness. Here, R.R.'s unfitness lay in his inability to parent M.P. without becoming proficient in the required healthcare skills necessary for her wellbeing. But R.R. could not achieve proficiency on his own no matter how much time he was given. The training required the participation of M.P., probably on a weekly basis for at least six months and perhaps longer for R.R.'s mother. The hearing evidence showed that M.P. could not handle the travel associated with that sort of schedule. The principal trainer offered no alternative way R.R. and his mother could become sufficiently skilled. Nobody else put forward some other realistic plan. In short, the evidence indicated little or no chance R.R. and his mother would ever become proficient caregivers for M.P.

We again feel constrained to point out that less than fully trained caregivers would literally pose a threat to M.P.'s life. R.R. could not take physical custody of M.P. on the assumption he would rely on skilled caregivers without becoming proficient himself. All kinds of predictable situations, such as a Kansas blizzard or some other emergency, could disrupt the continuous presence of hired caregivers. In sum, the factual record in the district court supports the finding that R.R's unfitness was unlikely to change in the foreseeable future.

R.R. suggests "child time" ought to play a diminished part in weighing unfitness and the likelihood of change because M.P. isn't fully cognizant of the passage of time. We presume M.P. may not appreciate time in the same way most other children do, although the evidence didn't directly address her cognitive abilities in that respect. But the argument really misses the broader point here. As we have said, given the circumstances, a fact-finder could conclude to a high probability R.R. would never achieve proficiency. The need for repetitive training, the travel required for the training, and the strain the travel puts on M.P. collectively confound realistic expectations for success. The district court, therefore, did not err in concluding R.R.'s unfitness was unlikely to change in the foreseeable future, as required under K.S.A. 2018 Supp. 38-2269(a).

M.P.'s best interests constitute the third requirement for termination. A child's best interests are assessed somewhat differently than unfitness or unlikelihood of change. As directed by K.S.A. 2018 Supp. 38-2269(g)(1), the district court should give "primary consideration to the physical, mental[,] and emotional health of the child" in making a best interests determination. A district court decides best interests based on a preponderance of the evidence. See *In re R.S.*, 50 Kan. App. 2d at 1116. The decision essentially rests in the district court's sound judicial discretion. 50 Kan. App. 2d at 1115-16. An appellate court reviews those sorts of conclusions for abuse of discretion. A district court exceeds that broad latitude if it rules in a way no reasonable judicial officer would under the circumstances, if it ignores controlling facts or relies on unproven factual representations, or if it acts outside the legal framework appropriate to the issue. See *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013); *State v. Ward*, 292 Kan. 541, Syl. ¶ 3, 256 P.3d 801 (2011).

What we have explained thus far largely directs the outcome of our best interests review. R.R. could not have assumed physical custody of M.P. at the time of the termination hearing. Everyone effectively agreed that would not have been in her best

12

interests. There was no realistic prospect that R.R. would be capable of assuming custody in some reasonable period of time, if ever.

D.K. and K.K. had shown themselves to be able caregivers for M.P. And they had taken preliminary steps to adopt her—a permanent bond unlike that a child has with even the most conscientious foster placement. They fully understood and embraced the burden they would assume in adopting M.P.

The district court carefully considered the relevant facts, as reflected in its lengthy findings, and did not misapprehend the legal framework governing best interests. Consistent with our review for abuse of discretion, we are simply left to ask whether no other district court would have come to the same conclusion about M.P.'s best interests. We are comfortable the answer must be that other district courts would have ruled in the same way.

Having dutifully reviewed the evidence and the arguments, we find no reversible error in the district court's decision terminating R.R.'s right to parent M.P.

Affirmed.